**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

| | |
|---|---|
| WINDSTREAM CORPORATION;<br>WINDSTREAM BENEFITS COMMITTEE;<br>WINDSTREAM SYSTEMS OF THE<br>MIDWEST, INC.; and VALOR<br>TELECOMMUNICATIONS OF TEXAS, L.P.,<br>d/b/a Windstream Communications Southwest | PLAINTIFFS |
| v.     No. 4:09CV00953 JLH | |
| JOHNNY LEE; HOMER A. MEEKINS;<br>DORENE R. FULLER; DONALD H. REMPE;<br>DONALD F. ANTHOLZ; CHARLES J. MOORE;<br>JOSEPH P. WANSOLICH; THOMAS FARRELL<br>WATTS; and TYRONE M. KIMREY | DEFENDANTS |

**OPINION AND ORDER**

The plaintiffs seek a declaratory judgment stating that they can unilaterally modify or terminate medical benefits that they provide to retirees, and they have filed a motion for summary judgment against the sole named defendant who has answered and defended, as well as a motion for default judgment as to the other named defendants. For reasons that will be explained, the Court holds that the terms of the plans at issue reserve to the plaintiffs the right unilaterally to modify or terminate retiree medical benefits.

**I.**

A court should enter summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets this burden,

the nonmoving party must respond by coming forward with specific facts establishing a genuine dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008). A genuine dispute exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make a showing sufficient to establish a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

## II.

Windstream Corporation is the plan sponsor of the Windstream Comprehensive Plan of Group Insurance ("the Windstream Pan"). Windstream Benefits Committee is the plan administrator of the Windstream Pan. Valor Telecommunications of Texas, LLC, f/k/a Valor Telecommunications of Texas, L.P., d/b/a Windstream Communications Southwest is a wholly-owned subsidiary of Windstream. Windstream Systems of the Midwest, Inc., is also a wholly-owned subsidiary of Windstream.

The Windstream Plan provides for the health and welfare benefits to retirees of Windstream, as well as Windstream's subsidiaries and predecessors. The subsidiary entities include Valor and Windstream Systems of Midwest. The predecessor entities include Alltel Corporation, Aliant Communications Co., and CT Communications, Inc.

According to the second amended complaint, Windstream has provided health and welfare benefits under the Windstream Plan to former employees of Valor who participated in the

Windstream Plan (the "Valor Retirees"); former employees of Alltel who retired before a 2006 spinoff, including retirees of various companies acquired by Alltel before a merger with Valor on July 17, 2006 (the "Legacy Retirees"); former employees of Aliant who retired before Aliant's merger with Alltel (the "Aliant Retirees"); and former employees of CT Communications who retired prior to January 1, 2008 (the "CTC Retirees").

The only defendant who has appeared and actively defended this action is Johnny Lee, a former bargaining employee of Valor and a former member of Communication Workers of America, AFL-CIO ("CWA").[1] Lee retired on March 3, 2006, under the 2005-2008 collective bargaining agreement between Valor and CWA. Pursuant to a memorandum of agreement that was part of the 2005-2008 collective bargaining agreement, Valor paid 80% of Lee's medical insurance premium. On July 1, 2010, Valor unilaterally reduced that contribution to $80 per month.

In addition to Lee, the named defendants are Donald F. Antholz, Dorene R. Fuller, Tyrone M. Kimrey, Homer Meekins, Charles J. Moore, Donald H. Rempe, Thomas Farrell Watts, and Joseph P. Wansolich, all of whom are retirees affected by the plan modifications at issue. According to the second amended complaint, Antholz, Fuller, and Wansolich were non-bargaining employees of Alltel; Kimrey and Meekins were bargaining employees of Alltel; Rempe and Moore were non-bargaining employees of Aliant; and Watts was a non-bargaining employee of Concord Telephone Company (CTC).[2] Document #176 at 3-5. Each of them was served with summons and complaint.

---

[1] CWA intervened and filed a cross-complaint alleging that Valor violated three memoranda of agreement included in three collective bargaining agreements when it unilaterally reduced its contribution to each retiree's medical premium. Valor moved to dismiss the cross-complaint, and the Court granted the motion. CWA's lawyers also represent Lee.

[2] The plaintiffs have filed a complaint, an amended complaint, and a second amended complaint, all of which sought to bind a class of defendants, but no motion for class certification was filed, and no class of defendants has been certified. Consequently, relief is granted only as to the

Antholz, Fuller, Kimrey, Meekins, Moore, Rempe, and Watts failed to answer or otherwise defend. Wansolich filed a pro se answer to the first amended complaint and stated that he did not plan to incur additional personal expenses to defend the matter. Document #27 at 3. Since then, Wansolich has not participated in this action, and he has not responded to the motion for default judgment or the motion for summary judgment. Thus, each named defendant other than Lee is in default. Fed. R. Civ. P. 55(a); *Canal Ins. Co. v. Ashmore*, 61 F.3d 15 (8th Cir. 1995).

The plan documents include the Windstream Comprehensive Plan of Group Insurance, Document #181-2; the Valor Telecommunications Health and Welfare Summary Plan Description, Document #181-3; the Alltel Benefits Handbook, which includes summary plan descriptions, Document #181-4; the Alltel Summary Plan Descriptions, Document #181-5-13; Aliant Communications Co. Plan Summary Plan Description, Document #181-14; CT Communications, Inc. Health and Welfare Benefit Plan, Document #181-15; March 1, 2002, Agreement of Recognition, Bargaining Procedure and Operating Contract between Valor and CWA, Document #181-16; March 1, 2005, Agreement of Recognition, Bargaining Procedure and Operating Contract Between Valor and CWA, Document #181-17; and Agreement Between Valor and CWA dated February 29, 2008, Document #181-18.

The amendments at issue make the following changes[3]:

Pre-65 Retirees:

- Effective July 1, 2010, pre-65 Legacy Retirees, all Valor Retirees and all CTC Retirees, were no longer be eligible to participate in the PPO Plan.

---

named defendants.

[3] This description of the amendments is taken from the plaintiffs' statement of undisputed facts, Document #181, which has not been controverted, so all of the facts stated therein are deemed admitted pursuant to Local Rule 56.1(c).

> Instead, they became eligible to participate in the Windstream Retiree Medical PPO Plan, currently administered by United Healthcare ("UHC"). [Footnote 3: Pre-65 Aliant Retirees became eligible to participate in the Windstream Retiree Medical PPO Plan on January 1, 2009.]

- Effective July 1, 2010, pre-65 Legacy Retirees, all Valor Retirees and all CTC Retirees who received a Windstream medical insurance subsidy began receiving a subsidy of $80 per month, not to exceed the cost of the medical plan premium.

- Effective July 1, 2010, all spousal subsidies were discontinued.

Post-65 Retirees:

- Effective July 1, 2010, Windstream no longer offered company-sponsored medical and prescription drug coverage insurance to post-65 Legacy Retirees, Valor Retirees and CTC Retirees. These retirees instead have the option to select individual insurance coverage through UHC Medicare Solutions.

- Effective July 1, 2010, post-65 Legacy Retirees and Valor Retirees who received a Windstream medical insurance subsidy, began receiving a subsidy of $17 per month, not to exceed the cost of the medical plan premium to be applied to offset the cost of UHC plans.

- Effective July 1, 2010, all spousal subsidies were discontinued.

- Effective July 1, 2010, Windstream terminated the HRA Plan. Effective July 1, 2010, post-65 CTC Retirees who participated in the HRA Plan began receiving a subsidy of $17 per month, not to exceed the cost of the medical plan premium to be applied to offset the cost of UHC plans. Effective January 1, 2014, all medical subsidies will be eliminated for certain Alliant and CTC retirees.

Dental Subsidy

- Effective June 30, 2010, Windstream's dental subsidy payment to the Legacy Retirees was terminated.

Aliant Retirees:

- Effective December 31, 2009, Windstream's COBRA subsidy payment to the surviving spouses of the Aliant Retirees was terminated.

- Effective December 31, 2009, Windstream's Medicare Part B reimbursement to the Aliant Retirees was terminated.

- Effective June 30, 2010, Windstream's dental subsidy payment to the Aliant Retirees and their dependents was terminated.

- Effective January 1, 2014, Windstream's premium medical subsidy payment for current and future Aliant Retirees and their dependents will be terminated (subject to exceptions for certain retirees who will continue to receive subsidies).

CTC Retirees:

- Effective January 1, 2014, Windstream's premium medical subsidy payment for current and future CTC Retirees and their dependents will be terminated (subject to exceptions for certain retirees who will continue to receive subsidies).

*See* Documents #181-19, #181-20, and #181-21.

In December of 2009, Windstream sent a letter to all Valor retirees, certain Legacy retirees, and CTC retirees, providing notice of the amendments. *See* Document #181-22. Also in December of 2009, the plaintiffs sent a similar letter to the Aliant retirees, providing notice of the amendments. *See* Document #181-23. On or about June 29, 2012, the plaintiffs sent a letter to affected retirees providing notice of the amendment dated June 27, 2012. *See* Document #181-24. Thus, Windstream has given timely notice of the amendments to the affected retirees. *See* Document #181 at 12. Lee and other defendants objected to Windstream's right to modify, amend, or terminate the retiree medical benefits. *See* Document #181-25.

**III.**

As a threshold issue, Lee argues that the Court is without jurisdiction because the plaintiffs lack standing to bring an action under ERISA.

Civil actions to enforce ERISA are authorized by 29 U.S.C. § 1132. In pertinent part, that statute provides that a civil action may be brought by a participant or beneficiary to recover benefits

due under the terms of the plan, to enforce rights under the plan, or to clarify rights to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). The statute also authorizes an action by a participant, beneficiary, or fiduciary to obtain an injunction or other equitable relief with respect to an act or practice that violates a provision of this statute or the terms of the plan. 29 U.S.C. § 1132(a)(3).

Lee argues that the plaintiffs lack standing because they are not plan participants or beneficiaries, nor do they bring this action as fiduciaries to seek equitable relief with respect to any act or practice that violates the statute or the plan. Lee further argues that this action is not authorized by the Declaratory Judgment Act, 28 U.S.C. § 2201 and § 2202, because the Declaratory Judgment Act is procedural in nature, *i.e.*, it enlarges the range of remedies available in federal courts but does not extend their jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72, 70 S. Ct. 876, 879, 94 L. Ed. 1194 (1950); *see also NewPage Wis. Syst. Inc. v. United Steel Workers Int'l Union*, 651 F.3d 775, 776-77 (7th Cir. 2011).

Nevertheless, "[f]ederal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question." *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 19, 103 S. Ct. 2841, 2851, 77 L. Ed. 2d 420 (1983). That principle has been held to mean that a district court has jurisdiction over an action brought by an insurer seeking a declaratory judgment action against an ERISA plan beneficiary who could have brought a claim against the insurer under 29 U.S.C. § 1132(a) to obtain benefits. *Transamerica Occ. Life Ins. Co. v. Digregorio*, 811 F.2d 1249, 1253 (9th Cir. 1987); *see also Reynolds v. Stahr*, 758 F. Supp. 1276, 1281 (W.D. Wis. 1991) (holding that the fiduciary and sponsor of an ERISA plan had standing to bring a declaratory judgment action against beneficiaries

who had the right to assert claims). Following *Transamerica* and *Reynolds*, the Eighth Circuit has held that a district court has jurisdiction over a declaratory judgment action brought by an insurance company seeking an interpretation of an ERISA plan. *Prudential Ins. Co. of Am. v. Doe*, 76 F.3d 206, 210 (8th Cir. 1996); *see also Maytag Corp. v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am.*, No. 4:08CV00291-JEG, 2009 WL 350649, at *4 (S.D. Iowa Feb. 11, 2009) ("Federal courts have jurisdiction over actions for declaratory judgment in cases where they would have jurisdiction over that same case if it were in the form of a coercive action brought by the declaratory judgment defendant."); *Rexam, Inc. v. United Steelworkers of Am., AFL-CIO-CLC*, No. CIV03-2998 ADM/AJB, 2003 WL 22477858, at *2 (D. Minn. Oct. 30, 2003) (following *Prudential* and *Transamerica* in holding that an employer who was a plan sponsor could bring an action for declaratory judgment where the defendants could have brought a coercive action under ERISA).

Here, the defendants could bring a coercive action under 29 U.S.C. § 1132(a) to seek benefits under the ERISA plan and could argue that the plan amendments were invalid and unenforceable. Therefore, the plaintiffs have standing to bring an action under the Declaratory Judgment Act to determine whether the plan amendments are valid and enforceable, and this Court has jurisdiction over the action.

## IV.

On the merits, Lee contends that the plaintiffs did not and do not have the right unilaterally to modify retiree medical plans because the benefits granted under those plans have vested. "A 'vested right' is commonly defined as a 'right that so completely and definitely belongs to a person that it cannot be impaired or taken away without that person's consent.'" *Halbach v. Great-West*

8

*Life & Annuity Ins. Co.*, 561 F.3d 872, 877 (8th Cir. 2009) (quoting Black's Law Dictionary 1349 (8th ed. 2004)).

"While ERISA mandates vested pension benefits, Congress did not mandate vesting for employee welfare benefit plans, like the health care plan[s] at issue here." *Id*. "'Therefore, an employer may unilaterally modify or terminate medical benefits at any time absent the employer's contractual agreement to the contrary.'" *Id.* (quoting *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 949 (8th Cir. 1994)). "It is possible for welfare benefits to vest, however, if a promise to provide vested benefits is incorporated in some fashion into the formal written ERISA plan." *Id.* (citing *Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 790 (8th Cir. 2002)).

Lee contends that the memoranda of agreement relating to retiree medical benefits, which were part of the 2002, 2005, and 2008 collective bargaining agreements between Valor and CWA, created vested rights for Valor employees who retired during the term of one of those memoranda of agreement. The 2005 memorandum of agreement, which was in effect when Lee retired, states that Valor and CWA "agree to provide retiree medical benefits for eligible employees who retire between March 1, 2005 and February 28, 2008." Document #181-17 at 139. The 2002 and 2008 memoranda of agreement contain similar language. *See* Document #181-16 at 148; Document #181-18 at 119. The second paragraph of all three memoranda of agreement provides:

> In order to receive Retiree Medical Benefits, the retiree must pay a percentage/ amount of the Retiree Medical premium ("Retiree Contribution Percentage/ Amount"). Similarly, the Company will pay a percentage/amount of the premium ("Company Contribution Percentage/Amount"), subject to Section 3 below. During the term of this Memorandum of Agreement, the Company and retiree Contribution Percentages/Amount will be based on the following contribution schedule:

| Years of Accredited Service at Retirement | Company Contribution Percentage | Retiree Contribution Percentage/Amount |
|---|---|---|
| Less than 10 | 0 | 100 |

| | | |
|---|---|---|
| 10 through 14 | 20 | 80 |
| 15 through 19 | 40 | 60 |
| 20 through 24 | 60 | 40 |
| 25 through 29 | 80 | 20 |
| 30 and over | 90 | 10 |

According to Lee, the premium cost allocation stated in this paragraph is a vested right and as such cannot be modified by the company.

Whether medical benefits are vested is a matter of contract, so the Court must begin its inquiry with the written plan documents. *Halbach*, 561 F.3d at 877. In interpreting the provisions of the plan documents, the Court gives words their common and ordinary meaning as a reasonable person would understand them. *Id.* (citing *Barker v. Ceridian Corp.*, 122 F.3d 628, 632 (8th Cir. 1997)). Extrinsic evidence is only admissible to assist the Court in interpreting ambiguity in an agreement. *Id.* Finally, the burden of proof rests on the party trying to establish that the employer intended the benefits to vest. *Id.* (citing *Hutchins v. Champion Int'l Corp.*, 110 F.3d 1341, 1345 (8th Cir. 1997)).

As noted, the first two sentences of the second paragraph in each memorandum state that the retiree must pay a percentage of the medical premium and that Valor will pay a percentage of the premium; and the final sentence states the percentages that serve as the basis of Valor and the retiree's contribution percentages during the term of each memorandum. Considered alone, this paragraph does not establish that the parties intended that the contribution percentages paid would be permanently vested as a contractual right. The phrase "[d]uring the term of this Memorandum Agreement" indicates that the stated premium contribution percentages in that memorandum would last only until the memorandum expired, which is inconsistent with the notion that the parties

intended that the premium contribution allocation would be permanent.[4] *See, e.g.*, *Crown Cork & Seal Co., Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 501 F.3d 912, 917-18 (8th Cir. 2007) ("A 'clause expressly limiting the duration of the retirement health benefits . . . to the duration of the Master Agreement . . . [is] inconsistent with an intent to vest health benefits for life.'") (quoting *John Morrell & Co. v. United Food & Commercial Workers Int'l Union*, 37 F.3d 1302, 1307 (8th Cir. 1994)); *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1519 (8th Cir. 1988). At most, the language of the second paragraph may indicate an intent to vest the premium contribution allocation for the terms of the respective collective bargaining agreements and memoranda.[5]

Moreover, the sixth paragraph of each memorandum of agreement grants Valor broad powers over the benefits at issue here:

> The level and administration of the Retiree Medical Benefits; amount or cost of premiums, premium pricing mechanisms; the attainment of the Maximum Company Contribution Amount; selection of the claims administrator, alternate health carrier or insurance carrier; eligibility for the benefits; all terms and conditions related

---

[4] In addition, the termination clause in the eighth paragraph of the 2005 memorandum of agreement states,

> This Memorandum of Agreement is effective on March 1, 2005, and shall expire on February 28, 2008. The parties specifically agree that the terms and conditions set forth in this Memorandum of Agreement, relating to retiree medical health benefits shall terminate on February 28, 2008, and shall not survive the expiration of this Memorandum of Agreement unless agreed to by the parties in writing.

Document #181-17 at 141.

[5] Both the 2002 and 2005 memoranda of agreement expired before Valor modified its premium contributions. The 2008 memorandum expired on February 28, 2011, before Valor modified its premium contributions on July 1, 2010. The 2008 memorandum of agreement, however, reserved to Valor the right to modify or rescind the funding of the retiree health plan, after notice to CWA, before the term of the memorandum expired. Document #181-18 at 121.

>hereto, and the resolution of any disputes involving the terms, conditions, interpretation, administration, or benefits payable shall rest with the Company and shall not be subject to the grievance or arbitration procedure set forth in the Collective Bargaining Agreement.

Document #181-16 at 149; Document #181-17 at 140-41; Document #181-18 at 118-19. A blanket reservation of control over certain benefits is fatal to any argument that those benefits are vested. *Crown Cork & Seal*, 501 F.3d at 918. Generally, "an unambiguous reservation-of-rights provision is sufficient without more to defeat a claim that retirement welfare plan benefits are vested." *Id.* (quoting *Stearns v. NCR Corp.*, 297 F.3d 706, 712 (8th Cir. 2002)).

This broad, unambiguous reservation of control over premium contributions and all other terms and conditions of retiree medical benefits, in conjunction with the contribution percentages' expressly limited duration in the second paragraph of each memorandum of agreement, distinguishes the instant action from those wherein the Eighth Circuit found reservation-of-rights clauses to be ambiguous. For example, in *Halbach* the Eighth Circuit held that a reservations-of-rights clause was ambiguous where it contained the qualification "provided, however, that no such modification shall divest a Participant of benefits under the Plan to which he has become entitled prior to the effective date of the amendment." *Halbach*, 561 F.3d at 880. Similarly, the Eighth Circuit has found reservation-of-rights clauses ambiguous where "it was not clear whether the right to change or terminate benefits only applied to those participants covered by the plan but not yet retired or whether it also included already retired pensioners." *Id.* at 879 (citing *Jensen*, 38 F.3d at 950;[6]

---

[6] The clause contained the following qualifications, "provided, however, that no such alteration, amendment or annulment shall permit any part of the Trust Fund, either corpus or income, to be used for or to be diverted to purposes other than for the exclusive benefit of the Employees or Participants or their beneficiaries" and "Unless otherwise expressly provided therein, amendments shall not be applicable to persons who are receiving pensions hereunder prior to the effective date of such amendment." *Jenson*, 38 F.3d at 948-49.

*Barker v. Ceridian Corp.*, 122 F.3d 628, 636 (8th Cir. 1997)).[7] In contrast, paragraph 6 in the memoranda of agreement at issue here includes no such qualifications or limits; it unambiguously grants to Valor complete control over the "amount or cost of premiums; premium pricing mechanisms; the Maximum Company Contribution Amount; . . . [and] all terms and conditions related hereto." Document #181-17 at 140-41.

Moreover, all of the plans at issue reserve to the employers the right to modify or terminate the plan benefits at any time. The Windstream Plan provides:

> 9.01 Amendments. The Board reserves the right to amend this Plan in whole or in part at any time and for any reason. The Board has granted amendment authority to the Windstream Benefits Committee or its delegate.
> \* \* \*
> 10.01 Right to Terminate. In accordance with the procedures set forth in this Article, the Board may terminate this plan at any time.[8]

Document #181-2 at 14. The Valor Retiree Health and Welfare Summary Plan Description states in its preface, "Although Valor Telecommunications expects and intends to continue the Valor Telecommunications Plan indefinitely, it reserves the right to terminate, amend, or replace the Valor Telecommunications Plan, in whole or in part, at any time and for any reason." Document #181-3 at 7.[9] Similarly, the Summary Plan Description of the Aliant Communications Healthcare Program

---

[7] The clause was qualified by the provision, "If the group Long-Term Disability Plan terminates, and if on the date of such termination you are totally disabled, your Long-Term Disability benefits and your claims for such benefits will continue as long as you remain totally disabled as defined by the plan." *Barker*, 122 F.3d at 636.

[8] The 2008 memorandum of agreement incorporates by reference the Windstream Medical Plan, which is one of the plans within the Windstream Plan.

[9] This plan description is incorporated by reference in the 2002 and 2005 memoranda of agreement.

13

states: "The Company reserves the right to modify, suspend, or terminate these benefits." Document #181-14 at 13. According to paragraph 25 of the plaintiffs' statement of undisputed facts:

> The Alltel Plan provided: "The Board reserves the right to amend this Plan in whole or in part at any time and for any reason. [. . .], the Board may terminate this Plan at any time". Exhibit 4, a true and correct copy of the Alltel Plan, at §§ 9.01, 10.01. The Summary Plan Descriptions for the Alltel Plan provided: "As with all provisions of the Plan, the Company expressly reserves the right to amend, modify, terminate, or partially terminate the Plan with respect to retiree and dependent coverage at any time." Exhibit 5, true and correct copies of the numerous Alltel Summary Plan Descriptions; Boyd Aff. at ¶ 18.

Document #181 at 8.[10] Several hundred pages of summary plan descriptions from the Alltel plan are included in the record, and throughout the various provisions of the plan, Alltel reiterated that it reserved the right to terminate the plan at any time.[11] For example, the PPO Plan Summary Plan Description states, "As with all provisions of the Plan, the Company expressly reserves the right to amend, modify, terminate or partially terminate the Plan with respect to retiree and dependent coverage at any time." Document #181-8 at 86. Finally, the CTC summary plan description states, in bold letters, "The Company reserves the right to add to, change or discontinue any of the benefits described." Document #181-15 at 5.

A blanket reservation of control over benefits is fatal to any argument that those benefits are vested. *Crown Cork & Seal*, 501 F.3d at 918. Generally, "an unambiguous reservation-of-rights provision is sufficient without more to defeat a claim that retirement welfare plan benefits are

---

[10] The Court did not find in the documents filed in support of the motion for summary judgment the language attributed by this paragraph to the Alltel plan. Nevertheless, the statement stands uncontroverted. *See* Local Rule 56.1(c).

[11] Document #181-4 at 55, 82, 88, 104, 110, 115, 119, 130, 141, 148; Document #181-5 at 8, 15, 23, 31, 45, 57, 71, 114; Document #181-6 at 35, 68; Document #181-7 at 18, 50, 84; Document #181-8 at 25, 49, 74; Document #181-9 at 30; Document #181-10 at 4, 43, 62, 83; Document #181-11 at 15, 29, 42, 71; Document #181-12 at 33, 65; Document #181-13 at 4, 50.

vested." *Id.* (quoting *Stearns v. NCR Corp.*, 297 F.3d 706, 712 (8th Cir. 2002)). Here, the relevant documents unambiguously reserve to the plaintiffs complete control over the amount and cost of premiums, premium pricing mechanisms, the maximum company contribution amount, and all terms and conditions related thereto, including the power to modify or terminate retiree medical benefits. Such provisions can only be overcome by "an affirmative indication of vesting" in the plan documents. *Crown Cork & Seal*, 501 F.3d at 918. *See also Am. Fed. of State, County, and Mun. Employees v. City of Benton*, 513 F.3d 874, 883 (8th Cir. 2008); *Hughes v. 3M Retiree Med. Plan*, 281 F.3d at 792-93 (reservation of rights provision in plan "devoid of vesting language" defeats vesting claim); *United Paperworkers Int'l Union v. Jefferson Smurfit Corp.*, 961 F.2d 1384, 1385 (8th Cir. 1992) (unambiguous reservation of rights clause and "absolutely nothing in the plan to contradict or cloud [its] plain and obvious meaning" defeats vesting claim); *Anderson*, 836 F.2d at 1519 (plan provision that retirement health benefits "may now or hereinafter be amended, modified or supplemented in collective bargaining" inconsistent with vesting).

"When interpreting ERISA plan documents, the Supreme Court has referred us to . . . the law of trusts[.]" *Halbach*, 561 F.3d at 877. "A power to revoke the trust includes the power to modify the terms of the trust, and the power to revoke only a portion of the trust includes the power to modify that portion." *Restatement (Third) of Trusts* § 63 cmt. g (2003). Here, the plan documents reserve to the employers the right unilaterally to rescind all retiree medical benefits, which means that the plaintiffs have the right unilaterally to modify all retiree medical benefits.

Even so, Lee argues that the provisions in the plan documents reserving to the company the right to terminate the plans do not necessarily mean that retiree medical benefits do not vest. For that argument, Lee cites *Bender v. Newell Window Furnishings, Inc.*, 725 F. Supp. 2d 642, 658-59 (W.D. Mich. 2010), *aff'd*, 681 F.3d 253, 267 (6th Cir. 2012). *Bender* followed *United Auto Workers*

15

*v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983), which held that retiree benefits were "status benefits that carry with them an inference that the parties intended the benefits to continue so long as the beneficiary remained a retiree." *Id.* at 1482. The Eighth Circuit has specifically rejected *Yard-Man*. *See Anderson*, 836 F.2d at 1516-17. Decisions of the Eighth Circuit, not the Sixth Circuit, bind this Court.

Lee also presents an argument based on the course of conduct between the parties. Specifically, Lee notes that Valor is a successor to GTE Southwest, and GTE Southwest's agreements in the 1990s provided for continuation of medical benefits to earlier retirees, whereas Valor's agreements did not, and he points out that Valor in fact continued medical benefits to prior retirees despite the absence of language in subsequent agreements continuing those benefits. The argument fails because the Court may not rely on extrinsic evidence inasmuch as the plan documents are not ambiguous. *Maytag Corp. v. United Auto Workers*, 687 F.3d 1076, 1084, 1086 (8th Cir. 2012) (holding that extrinsic evidence should not be considered where the plan document was not ambiguous); *Hughes*, 281 F.3d at 793 ("Since this court finds the ERISA document language unambiguous, we examine no extrinsic evidence."); *Howe v. Varity Corp.*, 896 F.2d 1107, 1110 (8th Cir. 1990) ("As a general rule . . . extrinsic evidence may not be relied upon where the documents are unambiguous on their face."); *see also Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*, 388 F.3d 15, 19-20 (1st Cir. 2004) ("The term 'extrinsic evidence' is imprecise but includes proof of negotiations between the parties, the post-contract conduct, and general trade practice."). Because the plan documents are unambiguous, the extrinsic evidence presented by Lee will not be considered.

Lee cites *John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers, AFL-CIO*, 913 F.2d 544, 551 (8th Cir. 1990), for the proposition that extrinsic evidence

can be admitted to demonstrate that an ambiguity exists. Lee's reliance on *John Morrell* is misplaced. In *John Morrell*, the Court said that extrinsic evidence may not be considered to contradict the intent of the parties as expressed in the written agreement. *Id*. Here as noted, the relevant provisions unambiguously reserved to Valor the right unilaterally to change the premium cost allocation. Lee's argument essentially is that extrinsic evidence can be introduced to show that Valor did not reserve the right unilaterally to change the premium cost allocation. Adopting Lee's argument would permit extrinsic evidence to contradict the parties' intent expressed in the written agreements.

Even if the proffered extrinsic evidence were considered on the issue of whether an ambiguity exists, that evidence would not alter the outcome. According to *John Morrell*:

> To determine whether there is an ambiguity, we must examine the relevant extrinsic evidence and decide whether the contractual language is reasonably susceptible of the meaning proposed by the party asserting the ambiguity.

*Id*. Although Valor reserved the right to amend, modify, or terminate the plan, according to Lee it did not reserve the right to adjust the allocation of the premium costs. Thus, Lee argues that the allocation of the premium costs could never be changed even though Valor could terminate the plan at any time. The plan documents could not reasonably be interpreted to mean what Lee contends they mean, even if extrinsic evidence were considered. Again, ERISA plan documents are construed according to the law of trusts, and the power to revoke a trust includes the power to modify it. *Halbach*, 561 F.3d at 877; Restatement (Third) of Trusts § 63 cmt. g (2003).

None of the extrinsic evidence tends to show an ambiguity in any of the relevant terms of the plan documents. None of the extrinsic evidence could show that the premium cost allocation was intended to survive the expiration of the memorandum of agreement in the face of express provisions within each memoranda limiting the duration of the cost allocation to the term of the

memorandum of agreement. None of the extrinsic evidence tends to show that there is some ambiguity in the provision stating that "all terms and conditions" relating to the level and administration of retiree medical benefits, the amount or cost of premiums, or premium pricing mechanisms, would rest solely with the company. Moreover, as noted, the right to terminate the plan includes the right to modify it. None of the extrinsic evidence tends to show that there is any ambiguity in the documents that reserve the right on the part of the company to amend, modify, or terminate the plan at any time.

Lee cites *Local Union No. 150-A, United Food & Commercial Workers International Union v. Dubuque Packing Co.*, 756 F.2d 66 (8th Cir. 1985), for the proposition that language in an agreement obliging an employer to provide retiree medical benefits without reference to prior agreements creates an ongoing, vested right to medical benefits. In *Dubuque Packing*, as here, the company and the union had a series of three-year agreements that included provisions relating to retiree benefits. The first two agreements specifically reaffirmed the medical benefits of past retirees, but the third one did not address the issue. *Id*. at 69. According to Lee, *Dubuque Packing* held that an ambiguity justifying resort to extrinsic evidence is created when a company agrees that medical benefits of retirees would be continued, eliminates the provision providing for continued benefits from a subsequent agreement, and nevertheless continues to make payments.

*Dubuque Packing* is not on point. In *Dubuque Packing*, the issue was whether medical benefits of retirees had vested, and the relevant documents were ambiguous on that point. Thus, the court looked to the contract language and course of conduct to determine whether medical benefits of retirees had vested. The court found, "there are many indications in the agreements and course of dealing that the parties intended the right to benefits would vest upon retirement." *Id*. at 70. Here, there are no indications in the agreements that the right to benefits would vest at retirement;

if there were, the agreements would be ambiguous, and it would be appropriate to consider extrinsic evidence.

## CONCLUSION

The plan documents unambiguously reserve to the company the right to modify or terminate retiree medical benefits at any time, so the plan amendments described above are legally valid. The plaintiffs' motions for summary judgment and default judgment are granted. Documents #179 and #180.

IT IS SO ORDERED this 26th day of February, 2013.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE